**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

LUXOTTICA RETAIL                      :
NORTH AMERICA INC.                    :
4000 Luxottica Pl.                    :
Mason, OH 45040                       :
                                      :     Case No. 1:14-CV-00581
  Plaintiff,               :
                                      :     Judge
   v.                  :
                                      :
VISION SERVICE PLAN                   :
3333 Quality Drive                    :
Rancho Cordova, CA 95670              :
                                      :
  Defendant.               :

## <u>COMPLAINT WITH DEMAND FOR JURY TRIAL</u>

1. Plaintiff Luxottica Retail North America Inc. ("LRNA") seeks injunctive relief, damages, and attorneys' fees against Defendant Vision Service Plan ("VSP") for misappropriation of trade secrets, tortious interference with business relations, conversion, unfair competition, and unjust enrichment.

2. VSP, acting through its senior executives, has misappropriated confidential and proprietary information belonging to LRNA and its affiliates, including trade secrets.

3. In September 2013, Michael Hansen ("Hansen") secretly accepted employment with VSP as its President of Global Retail Development while he remained employed as a senior executive with LRNA. For nearly three months, until December 2, 2013, Hansen actively deceived LRNA into believing that he was retiring because of health problems and because he wanted to spend more time with his family.

4.      During this three-month period, no one at LRNA knew that Hansen had become VSP's President of Global Retail Development.  On the other hand, VSP's senior executives knew that Hansen was still a senior executive for LRNA.

5.      While he was still a senior executive for LRNA, Hansen secretly copied hundreds of LRNA files onto an external hard drive and he disclosed internal LRNA information to VSP's Chief Executive Officer and other senior VSP executives.

6.      After leaving LRNA and moving to California, Hansen, as a senior VSP executive, used and disclosed LRNA's confidential information and trade secrets for the purpose of developing strategic plans.

7.      After becoming a senior executive for VSP, Hansen has repeatedly made misrepresentations about his conduct and the misappropriation of confidential information.

8.      Hansen has now admitted that he provided LRNA's information to VSP's Chief Marketing Officer, including a 72-page presentation describing LRNA's strategic plans over the next three years.  These documents contained confidential and proprietary information belonging to LRNA and its affiliates, including trade secrets.

9.       For at least several months, VSP's senior executives did nothing to stop Hansen from using and disclosing LRNA's confidential and proprietary information.

10.     Aided by LRNA's confidential and proprietary information, upon information and belief, Hansen and other senior VSP executives have already saved and intend to further save the considerable time and expense of developing their own strategic plans and business methods from scratch, allowing VSP to unfairly compete against LRNA.  LRNA invested significant time and resources to develop these strategic plans and business methods.

11.     VSP's senior executives who have improperly received confidential information and trade secrets, as well as the process they have collectively undertaken to establish a retail eyewear business to unfairly compete with LRNA, are tainted by the unlawful acts described above.

12.     Based on VSP's intentional and unlawful conduct, as set forth in detail below, LRNA is entitled to injunctive relief, compensatory damages, punitive and exemplary damages, and attorneys' fees.

## THE PARTIES, JURISDICTION, AND VENUE

13.     Plaintiff LRNA is an Ohio corporation with its principal place of business in Mason, Ohio.  The headquarters and executive leadership team for LRNA are also located in Mason, Ohio.  LRNA employs approximately 1,600 people at its headquarters in Mason, Ohio. LRNA is a citizen of Ohio.

14.     Defendant VSP is a California corporation with its principal place of business in Rancho Cordova, California.  The headquarters and executive leadership team for VSP are also located in Rancho Cordova, California.  VSP is a citizen of California.

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are citizens of different states, and the amount in controversy, including the value of injunctive relief sought, exceeds $75,000, exclusive of interest and costs.

16.     This Court has general personal jurisdiction over VSP because VSP routinely transacts business in this District, which gives VSP continuous and systematic contact within this District.

17.     This Court also has specific personal jurisdiction over VSP because much of VSP's wrongful conduct and the resulting injury to LRNA occurred in this District.

18.     Venue is proper under 28 U.S.C. § 1391 and S.D. Ohio R. 82.1 because LRNA's principal place of business is in this District, and because LRNA has suffered and will continue to suffer harm in this District.  Moreover, a substantial part of the events giving rise to the claims occurred in this District.

## **BACKGROUND**

19.     LRNA is an indirect, wholly owned subsidiary of Luxottica Group S.p.A. ("Luxottica Group"), a publicly traded company based in Milan, Italy.  Luxottica Group companies are engaged in the design, manufacture, distribution and marketing of house and designer lines of prescription frames and sunglasses, as well as performance optics products.

20.     LRNA sells prescription frames and eyewear at retail stores throughout North America.  LRNA owns and operates leading eyewear retailers such as LensCrafters, Pearle Vision, Sears Optical, Target Optical, Sunglass Hut, and ILORI.

21.     LRNA owns EyeMed Vision Care, LLC ("EyeMed"), which provides vision care benefits to approximately 35 million members in the United States.

22.     Luxottica U.S. Holdings Corp. ("Luxottica") owns LRNA and Luxottica USA LLC ("Luxottica USA"), which is a wholesale seller of eyewear frames in North America.

23.     VSP was initially a tax exempt organization that provided managed vision care services.  In 2003, the IRS determined that VSP did not qualify for tax exempt status.  VSP's challenges to this ruling were rejected.

24.     VSP designs and sells managed vision care plans.  VSP maintains a large network of practicing optometrists who offer services to members of VSP benefit plans.

25.     VSP and EyeMed are competitors.  VSP and EyeMed are two of the largest vision benefit providers in the United States.

26.     In 1992, VSP launched Altair Eyewear, a company that sold frames to doctors in the VSP network.  In 2008, VSP acquired Marchon, a manufacturer and distributor of eyewear.  Marchon and Altair are wholesale sellers of eyewear.  Altair, Marchon and Luxottica USA compete in the wholesale eyewear market.

27.     VSP does not currently operate retail stores and, up until 2013, did not compete with LRNA.  In January 2014, VSP announced the creation of a Global Retail Development Division.  VSP is attempting to develop a retail business with the assistance of LRNA's confidential information and trade secrets.

## LRNA'S SENIOR EXECUTIVES ARE ENTRUSTED WITH CONFIDENTIAL, PROPRIETARY AND STRATEGIC INFORMATION

28.     LRNA's senior executives are entrusted with knowledge of Luxottica and LRNA's confidential and proprietary information, including but not limited to trade secrets.  LRNA has a fiduciary relationship with its senior executives, and they are obligated to act in the best interests of LRNA.

29.     Wendy Hauteman was an executive for LRNA for more than thirteen years, from September 1999 through May 2013.  Most recently, Hauteman was Vice President of Brand Marketing and Visual Merchandising for one of LRNA's retail brands.

30.     In this role, according to Hauteman's LinkedIn page, she led the overall brand strategy, promotional strategy, media planning and creative development for 700 corporate and franchised retail stores.

31.     Michael Hansen worked for LRNA or other companies within Luxottica for more than 25 years, from approximately November 1986 through December 2013.  Most recently, he was LRNA's Senior Vice President for Strategic Environments.

32.     LRNA's Strategic Environments Group is responsible for the design and sustainability of more than 5000 retail eyewear stores in North America.  In this role, according to his resume, Hansen controlled a budget of more than $120 million.  A redacted copy of Hansen's resume is attached as Exhibit A.

33.     As senior executives, both Hauteman and Hansen were entrusted with knowledge of Luxottica and LRNA's sensitive and confidential information, including trade secrets such as the company's strategic plans, retail strategies, performance metrics, revenue projections, business methods, sales information, profitability data, costs, and margins.

34.     For example, both Hauteman and Hansen regularly attended meetings with LRNA's other top executives to discuss many of the important projects and strategic initiatives being implemented by LRNA.  This included monthly meetings of the LRNA Leadership Team, which only includes executives at the level of Director or above.  Much of the information discussed and disclosed at LRNA Leadership Team meetings is confidential.

35.     Hauteman and Hansen were privy to many of LRNA's confidential three-year strategic plans.

36.     As part of the LRNA Leadership Team, Hauteman and Hansen also had access to confidential and proprietary information related to the other companies within Luxottica, including but not limited to trade secrets.  For example, they were entrusted with highly confidential information about the business plans, finances, and strategies employed by EyeMed in operating vision care benefit plans and working with the other companies within Luxottica.

37.     Hauteman and Hansen both entered into Confidentiality Agreements during their employment with LRNA prohibiting them from communicating with any other person or company about confidential information and requiring them to return any documents or other

information at the end of their employment. A copy of Hansen's LRNA Confidentiality Agreement is attached as Exhibit B, and a copy of Hauteman's Confidentiality Agreement is attached as Exhibit C.

## LRNA'S PROTECTION OF CONFIDENTIAL, PROPRIETARY AND STRATEGIC INFORMATION

38.     LRNA and Luxottica invested millions of dollars developing its trade secrets, retail strategies, business plans, proprietary processes, pipelines, sales methods, and other confidential and proprietary information.

39.     In view of these investments, LRNA has in place measures to maintain the secrecy and confidentiality of its confidential and proprietary information, including information it entrusted to executives like Hauteman and Hansen. These efforts include ethics policies, confidentiality policies and agreements, computer use policies, physical security measures, and restrictions on the computer network.

40.     LRNA has 24-hour security personnel at its physical facilities. LRNA stores information on servers that are only accessible to employees with approved rights to view information, and requires each individual employee to enter a unique password to access the computer network.

41.     LRNA also protects its confidential and proprietary information through the use of agreements with contractors, executives and professional employees.

## VSP SECRETLY RECRUITS HANSEN AND SEEKS HIS ASSISTANCE IN DEVELOPING RETAIL STRATEGY WHILE HE IS STILL A SENIOR EXECUTIVE FOR LRNA

42.     Sometime prior to June 2013, VSP recruited and hired Hauteman to become VSP's Senior Vice President for Global Strategic Marketing.

43.     After accepting a position as VSP's Senior Vice President for Global Strategic Marketing, Hauteman entered into a severance agreement with LRNA. The severance agreement again prohibited Hauteman from using or disclosing any information of a confidential or secret nature that she acquired during her employment. It also required her to return all confidential information to LRNA, as well as any computer hardware, files, memoranda, and financial data.

44.     After Hauteman became VSP's Senior Vice President for Global Strategic Marketing, upon information and belief, VSP asked her to disclose confidential information about the profitability of EyeMed, the primary competitor of VSP.

45.     On July 10, 2013, after she became a senior executive and agent for VSP, Hauteman met with Hansen for drinks. She then left Hansen a voicemail about an "opportunity" with VSP.

46.     As a senior executive and agent for VSP, Hauteman knew that Hansen was prohibited from communicating with any other person or company about confidential information and was required to return any documents or other information at the end of his employment, because she was subject to the same obligations to LRNA.

47.     The next day, Hansen sent Hauteman an email indicating that he was "looking forward to seeing the job description" and disclosing that he was in "3YP [strategic planning] presentations all day" for LRNA.

48.     Later the same day, Hauteman sent Hansen a "VERY CONFIDENTIAL job description [emphasis in original]," asking him to "keep this off the record." She informed Hansen that VSP's Chief Executive Officer "is a visionary and is taking the company to places it has needed to go for years. (i.e. 'retail')."

49.     Hauteman further advised Hansen, "Do not not not [sic, emphasis in original] forward that description to anyone else."  She made clear that VSP did not want Luxottica "to know they are talking retail" and that "EyeMed is [VSP's] number one enemy."

50.     The following day, Hauteman informed Hansen that VSP was "hungry for retail experience – as they have none."

51.     On July 19, Hansen sent his resume to VSP's Director of Workforce Development, stating that Hauteman "mentioned (under strict confidentiality) VSP's desire to invest in a retail strategy beginning with hiring a President of Retail."

52.     In his email to VSP's Director of Workforce Development, Hansen asked for "extreme sensitivity and confidentiality" due to "the competitive nature of our organizations."  A copy of this email is attached as Exhibit D.

53.     On July 25, VSP's Director of Workforce Development had an "exploratory chat" with Hansen.  Less than a week later, VSP's Director of Workforce Development emailed Hansen to remind him that "confidentiality is key!"

54.     VSP's Director of Workforce Development informed Hansen on August 1 that VSP had decided to "jump a step" and bring Hansen to its offices in Rancho Cordova, California to meet with its Chief Executive Officer and other business leaders, "and potentially more."

55.     On August 4, Hauteman sent Hansen an email explaining what he should expect at his meetings with VSP's Chief Executive Officer and other senior executives.  She informed Hansen that VSP's Chief Executive Officer "[w]ill ask you question [sic] about Luxottica – and likely about EyeMed."

56.     Hauteman disclosed that VSP's Chief Executive Officer had asked her for specific information about EyeMed.

57.     On or around August 7, VSP's Chief Executive Officer and Hansen planned a telephone conference to discuss VSP's "strategic growth pillars for the next 3 years," its "decision to launch a retail strategy," "the investment required to build a global retail arm," and "vertical integration strategies" with VSP's retail eyewear brands.  A copy of Hansen's email regarding the telephone conference with VSP's Chief Executive Officer is attached as Exhibit E, and an outline of the strategic questions is attached as Exhibit F.

58.     On the same day VSP's Chief Executive Officer planned to speak on the telephone with Hansen, VSP asked Hansen to sign a Non-Disclosure Agreement agreeing not to disclose or use any of VSP's confidential information.  A copy of an email referencing the Non-Disclosure Agreement is attached as Exhibit G.

59.     VSP asked Hansen to enter into this Non-Disclosure Agreement despite knowing that he was still a senior executive who had a business and fiduciary relationship with LRNA.

60.     On August 8, Hansen signed the Non-Disclosure Agreement with VSP.  A copy of an email with Hansen's signed Non-Disclosure Agreement is attached as Exhibit H.

61.     On or about August 12, VSP's Chief Executive Officer and other senior executives met with Hansen at their offices in Rancho Cordova, California.  This also included VSP's General Counsel and Chief Marketing Officer, among other VSP officers and senior executives.

62.     Following these meetings, on August 13 and August 14, Hansen sent separate emails to VSP's Chief Executive Officer and Chief Marketing Officer encouraging VSP to "enter the retail market."  Hansen proclaimed that the "category and it's [sic] gorillas are ripe for the picking."  On August 14 and August 15, Hansen sent similar emails to at least five other VSP

executives.  A copy of Hansen's email to VSP's Chief Executive Officer is attached as Exhibit I, and a copy of Hansen's email to VSP's Chief Marketing Officer is attached as Exhibit J.

63.     Luxottica is a global leader in the retail eyewear market.  Both Hansen and VSP's executives understood that Luxottica was the "gorilla" that Hansen advised was "ripe for the picking."

64.     The President of one of VSP's business divisions responded to Hansen and stated that "I would enjoy the opportunity to work closely with you to shape that future and whacking [sic] a few gorillas."

65.     On or around August 29, VSP's Chief Executive Officer scheduled another telephone conference with Hansen for the following day.  Hansen emailed Hauteman and informed her, "VSP here I come!"

66.     VSP's Chief Executive Officer and other VSP officers and senior executives interfered with Hansen's business and fiduciary relationship as a senior executive with LRNA by seeking his assistance and advice in competing against his own employer.

## VSP SECRETLY HIRES HANSEN AS ITS PRESIDENT OF GLOBAL RETAIL DEVELOPMENT BUT DOES NOT PUBLICLY REVEAL HIS NEW POSITION

67.     On or about September 5, 2013, Hansen signed an agreement formally accepting an offer to become VSP's new President of Global Retail Development.

68.     In this role, Hansen reports directly to VSP's Global Chief Executive Officer. Upon information and belief, Hansen received a significant compensation package.  A copy of VSP's offer letter to Hansen is attached as Exhibit K, and a copy of Hansen's signed acceptance is attached as Exhibit L.  A copy of the press release announcing Hansen's new position in *Vision Monday*, a leading industry trade publication, is attached as Exhibit M.

69.     The following day, Hansen completed a drug test for his new senior executive position with VSP.

70.     On the same day, Hansen met with LRNA's Chief Operations Officer and Senior Director of Human Resources.  He did not inform them that he had accepted a position with another employer, let alone a competitor seeking to build a new optical retail business to directly compete against LRNA.

71.     Instead, even after formally accepting a senior executive position and becoming an agent of VSP, Hansen told LRNA's executives that he was retiring.  Hansen claimed that he was retiring because of his health problems and because he was unhappy in his position and wanted to spend more time with his family.

72.     Because Hansen led LRNA to believe he was retiring, rather than going to work for a competitor, he was able to continue working at LRNA, receiving access to LRNA's confidential and proprietary information for nearly three months after he had already accepted a senior executive position and began acting on VSP's behalf.

73.     During this three-month period, upon information and belief, VSP continued to interfere with Hansen's business and fiduciary relationship as a senior executive with LRNA and did not reveal that he had accepted a position to become VSP's President of Global Retail Development.

74.     On September 10, for example, VSP's Chief Executive Officer emailed Hansen to ask about his conversations with LRNA executives.  He received a response from Hansen informing him that Hansen was meeting with a senior LRNA executive the following day and that "I have made a commitment to VSP and you, and I am a man of my words."

75.     The next day, VSP's Chief Executive Officer received another email from Hansen to confirm, "I am 100% VSP!!!"

76.     On September 16, VSP's Chief Executive Officer received an update from Hansen indicating, "I received my Luxottica separation agreement on Friday including date of separation."  Hansen also asked VSP's Chief Executive Officer to "connect" with him so that they could develop "first 90 day objectives."

77.     On October 1, VSP's Chief Executive Officer received another update from Hansen informing him that "[i]nternal communications regarding my retirement **from Luxottica** are complete! [emphasis in original]" and that "[w]e will continue to protect confidentiality as to where I am going until January."

78.     On October 6, VSP's Chief Marketing Officer met with both Hauteman and Hansen for dinner in California.  The next day, VSP's Chief Executive Officer, Chief Marketing Officer, and Senior Vice President for Global Strategic Marketing received emails from Hansen stating, "Counting the days to VSP!"

79.     Upon information and belief, VSP's Chief Marketing Officer also continued to interfere with Hansen's business and fiduciary relationship with LRNA by seeking LRNA's and Luxottica's confidential information.

80.     On October 23, VSP's Chief Marketing Officer spoke to Hansen on the telephone regarding "a rumor floating around."  Following this conversation, VSP's Chief Marketing Officer received an email from Hansen to thank her "for bring[ing] this to my attention," calling her a "great partner" and promising that they would "do magical things together."

**VSP'S SENIOR EXECUTIVES REVIEW AND DISCUSS INTERNAL LUXOTTICA INFORMATION AND HANSEN COPIES LRNA'S CONFIDENTIAL INFORMATION AND TRADE SECRETS TO BENEFIT VSP**

81.     As set forth above, as Hauteman informed Hansen prior to his meetings with senior VSP executives, VSP's Chief Executive Officer specifically expressed an interest in receiving information about Luxottica and EyeMed.

82.     On November 1, Hansen provided VSP's Chief Executive Officer, Chief Marketing Officer, and another senior VSP executive with an internal Luxottica announcement about EyeMed.  This internal announcement was circulated to LRNA's North American Leadership Team by Luxottica Group's Chief Executive Officer.  A redacted copy of this email is attached as Exhibit N.

83.     On the same day, upon information and belief, VSP's Chief Executive Officer spoke with Hansen on the telephone to discuss the internal Luxottica announcement.  Hansen also called Hauteman and attempted to call VSP's Chief Marketing Officer.

84.     On November 3, 2013, VSP's Chief Marketing Officer responded to Hansen's email forwarding the internal Luxottica announcement.  A copy of this email is attached as Exhibit O.  The email stated:

> Thanks Michael!  Sorry I missed your call on Friday.  I got the download from Wendy [Hauteman] and Rob [Lynch, VSP's Chief Executive Officer].  Very interesting times…

85.     Upon information and belief, therefore, VSP's Chief Marketing Officer received a "download" from Hauteman and VSP's Chief Executive Officer regarding internal Luxottica information provided by Hansen during one or more telephone calls on November 1.

86.     During the last month of his employment, well after he accepted a senior executive position and began acting as an agent for VSP, Hansen used his company-owned

computer and his personal email account at "me.com" to transfer and misappropriate LRNA's confidential and proprietary information, including trade secrets.

87. For example, on November 7, approximately two weeks before his last day at LRNA's offices in Mason, Ohio, Hansen emailed a confidential valuation summary for a retail acquisition opportunity to his personal email account at "me.com." The opportunity was referred to internally as Project 21. The summary included detailed valuation tables, projected retail growth rates, anticipated sales through the end of the decade for each individual store, and other confidential and proprietary information. A copy of this email is attached as Exhibit P.

88. On November 14, VSP's Director of Corporate Communications sent Hansen a VSP press release for his "thoughts and input," despite Hansen's ongoing business and fiduciary relationship as a senior executive for LRNA. On the same day, Hansen emailed VSP's Office Manager and again confirmed that he was "counting the days!"

89. During the last two weeks of his employment, more than two months after he accepted a senior executive position and began acting on VSP's behalf, Hansen connected an external LaCie hard drive to his LRNA-owned laptop computer beginning on November 18 and selectively copied approximately 200 electronic files containing LRNA's and EyeMed's strategic plans, finances, retail strategies, business plans, sales and profitability, and other confidential and proprietary information, including trade secrets.

90. Hansen copied documents to the LaCie drive that contained highly confidential and sensitive information that would be extremely valuable to competitors of LRNA and Luxottica, including information about LRNA, Luxottica and their affiliates that Hansen had no legitimate business purpose to access.

91. For example, Hansen copied:

(a)     Presentations to LRNA's Senior Leadership Team, which contained extremely sensitive and highly confidential information about the strategic plans of LRNA and other companies within Luxottica, such as EyeMed, VSP's competitor in providing vision benefits;

(b)     Strategic plans for store development which contain highly confidential information about performance metrics and three-year performance targets for LensCrafters, Pearle Vision, Sears Optical, Target Optical, Sunglass Hut, and ILORI, as well as information about the costs of store maintenance, utilities, and other expenses for each of these brands;

(c)     Confidential information about a strategic partnership of Target Optical (a brand operated by LRNA) related to revenue from the sale of contact lenses;

(d)     Strategic updates prepared by the Strategic Environments team for Sunglass Hut;

(e)     Confidential information about prototype store tests, store requirements, rollout costs, build out risks, store delivery timelines, and social media strategies for Pearle Vision (a brand operated by LRNA);

(f)     Presentations for Strategic Environments Team meetings, including key initiatives related to the store delivery pipeline, fleet services, operating and capital expenditures, item costing, and other confidential information.

92.     On November 22, 2013, Hansen sent an email to dozens of executives from LRNA and Luxottica, announcing that he was "retiring" that day. Hansen thanked the executives for their "unselfish ways" and called LRNA "a magical place."

93.     Through his last day of employment with LRNA, Hansen continued to maintain that he was retiring and did not inform LRNA that he accepted a senior executive position several months earlier and began acting on VSP's behalf.

94.     As a result, Hansen's company email address was not immediately disabled and Hansen continued to have access to LRNA's computer network until the end of his final day of employment with the company.

95.     On December 2, the last day of Hansen's employment with LRNA, and nearly three months after he accepted a senior executive position and began acting as an agent for VSP,

Hansen again used his personal email account at "me.com" to transfer and misappropriate highly confidential information about one of the most important projects he oversaw during the last year of his employment. Minutes before signing his separation agreement and turning in his company computer to Luxottica, Hansen sent to his personal email account at "me.com" a confidential presentation about Project Transformation, which described the six-month process for developing a new business process and pipeline for the development of new retail eyewear stores. This highly sensitive document contained the final pipeline and process redesign for LRNA's new store delivery process. A copy of this email is attached as Exhibit Q.

96.     This confidential business process was the culmination of a team of five LRNA employees working for six months, as well as guidance and insight from an external consultant, Gear Management Group, LLC, and input from top executives with LensCrafters, Pearle Vision, Sears Optical, Target Optical, Sunglass Hut, and ILORI.

97.     LRNA had entered into an agreement with Gear Management Group, LLC to protect its confidential and proprietary information. Gear Management, LLC is prohibited from disclosing LRNA's confidential information to third parties and from using confidential information for any purposes other than performing work for LRNA. Gear Management, LLC agreed to take all appropriate steps to safeguard LRNA's confidential information.

98.     Because VSP does not currently have a retail eyewear division, it would take VSP much longer than six months to develop a store delivery pipeline similar to the one Hansen sent to his personal email account and misappropriated. Even with the help of Gear Management Group, LLC, and the benefit of an experienced team working full time on Project Transformation, this new store delivery pipeline still took LRNA six months to develop.

99.     Hansen's unlawful transmission and possession of this store delivery pipeline as a senior executive and agent of VSP gave VSP an unfair head start in developing its plans to enter the retail eyewear market and unfairly compete against LRNA.

## HANSEN RETAINS POSSESSION OF LUXOTTICA'S STRATEGIC PLANS AND OTHER CONFIDENTIAL AND PROPRIETARY INFORMATION FOR THE BENEFIT OF VSP

100.     On December 2, Hansen signed a separation agreement with LRNA.  Hansen accepted a significant separation payment.  The separation agreement again prohibited Hansen from using or disclosing any information of a confidential or secret nature that he acquired during his employment.

101.     The separation agreement also required Hansen to return all confidential information to LRNA, as well as any computer hardware, files, memoranda, and financial data.

102.     Despite his promises to do so, Hansen failed to return any of LRNA's information upon his separation of employment.

103.     Instead, Hansen retained LRNA's information and documents and then used and disclosed them for the benefit of VSP, as set forth below.

## SENIOR VSP EXECUTIVES MISAPPROPRIATE AND USE LRNA'S STRATEGIC PLANS AND OTHER CONFIDENTIAL AND PROPRIETARY INFORMATION TO DEVELOP STRATEGIC PLANS FOR VSP

104.     Upon information and belief, Hansen began working at VSP's offices in Rancho Cordova, California, on or about January 1, 2014.

105.     Upon information and belief, Hansen is one of the top seven executives in the VSP organization, as President of Global Retail Development.  He reports directly to VSP's Chief Executive Officer.

106.     During the first week of January 2014, VSP's Chief Marketing Officer met with other senior VSP executives to discuss strategic planning.  Hansen attended this meeting as

VSP's President of Global Retail Development. A copy of an affidavit from Hansen discussing this meeting is attached as Exhibit R.

107. At this meeting, according to Hansen, he had a discussion with VSP's Chief Marketing Officer about the difficulty she was experiencing coming up with an effective process for developing a strategic plan at VSP.

108. After this meeting, acting in his capacity as a senior executive for VSP for the purpose of assisting with the development of a strategic plan for VSP, Hansen reviewed documents and files on his personal computer that contained confidential and proprietary information belonging to LRNA and Luxottica, including trade secrets.

109. Hansen also sent two of LRNA's documents to VSP's Chief Marketing Officer so that she could also use them to develop strategic plans for VSP. Cover pages from these two documents are attached as Exhibit S and Exhibit T.

110. The documents Hansen disclosed to VSP's Chief Marketing Officer included a 72-page presentation containing confidential and proprietary information about LRNA's strategic plans over the next three years, including trade secrets. This document includes detailed confidential information about investments in various retail brands, costs per unit, performance metrics, three-year goals and ambitions, strategic imperatives, and eCommerce transition timelines, among other confidential and proprietary information.

111. Over the next several months, while he continued to develop strategic plans as one of VSP's top executives, Hansen continued to be in possession of documents and files obtained during his employment with LRNA and Luxottica, including the company's strategic plans, retail strategies, performance metrics, revenue projections, business methods, sales

information, profitability data, costs, margins, and other confidential and proprietary information.

## HANSEN CONTINUES TO MISLEAD LRNA AND CONCEAL HIS SECRET LRNA FILES BY CLAIMING HE WAS NOT IN POSSESSION OF ANY LUXOTTICA INFORMATION AFTER HIS EMPLOYMENT

112.     On January 15, 2014, a press release was published in *Vision Monday* announcing "VSP Global Hires Michael Hansen, formerly of Luxottica, as President of New Retail Development Division." (*See* Exhibit M).

113.     When LRNA learned that Hansen had lied about retiring and had instead accepted a position with VSP, LRNA began to investigate Hansen's activities over the last several months of his employment. LRNA reviewed the company computer that Hansen had returned on his last day of employment. As a result, LRNA began to discover evidence that Hansen improperly transferred and copied confidential and proprietary information, including trade secrets, for the benefit of VSP.

114.     On March 28, 2014, LRNA's attorneys sent Hansen a letter informing him, "We believe Mr. Hansen may still be in possession of LRNA's confidential information and trade secrets, including but not limited to retail strategies, plans, project outlines, blueprints, and senior leadership information." A copy of the letter is attached as Exhibit U.

115.     LRNA's attorneys asked that Hansen "immediately cease and desist from using or disclosing any of LRNA's confidential information and trade secrets," and requested that Hansen "[p]lease immediately return to me via Federal Express delivery any information obtained during Mr. Hansen's employment with LRNA by 5:00 p.m. on Tuesday, April 1."

116.     LRNA's attorneys subsequently spoke to Hansen's attorney on the telephone several times, and met with Hansen's attorney in person. For example, LRNA's attorney spoke

to Hansen's attorney by telephone on March 31. Hansen's attorney reported that Hansen denied taking any of LRNA's confidential information.

117.     On April 18, Hansen's attorney repeated her assurances that Hansen did not take any confidential information; however, Hansen's attorney said that she would gather additional information and make an offer for resolving any disputes between the parties.

118.     On April 25, Hansen's attorney sent an email to LRNA's attorney claiming in writing that "Mr. Hansen did not transfer, download, copy, or in anyway [sic] take any information or documents when he left Luxottica."

119.     These representations by Hansen, while serving as a senior executive for VSP, were knowingly false.

120.     Upon information and belief, Hansen made these false representations to protect VSP and conceal his disclosure and VSP's use of LRNA's confidential and proprietary information, including trade secrets.

**LRNA DISCOVERS THAT VSP'S SENIOR EXECUTIVE USED AND DISCLOSED ITS CONFIDENTIAL INFORMATION AND TRADE SECRETS AND DEMANDS THAT VSP CEASE AND DESIST FROM ANY FURTHER USE OR DISCLOSURE**

121.     On April 29, 2014, prior to submitting its claims against Hansen to binding arbitration in Ohio as required by the separation agreement, LRNA filed a complaint seeking equitable relief from this Court to preserve its rights and stop Hansen from using its strategic plans, business processes, and other confidential and proprietary information and trade secrets (as permitted by the separation agreement).

122.     Even after the lawsuit was filed, Hansen continued to maintain that he did not take any information obtained during his employment with LRNA.

123.     Hansen also claimed that he never disclosed any of LRNA's information to VSP.

124. On May 9, 2014, Hansen's attorney sent an email to LRNA's attorney indicating that Hansen claimed that "not a word, deed, paper, or idea that belongs to Luxottica has been used or transmitted by Mr. Hansen to anyone, period – end of story."

125. This was not the end of the story. On May 20, 2014, this Court entered an Agreed Order Granting Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Motion for Expedited Discovery ("Order and Preliminary Injunction").

126. Pursuant to the Order and Preliminary Injunction, Hansen produced his personal computer for forensic analysis. As a result, LRNA discovered that contrary to his representations, Hansen continued to be in possession of documents and files obtained during his employment with LRNA.

127. Pursuant to the Order and Preliminary Injunction, Hansen also provided LRNA with two affidavits.

128. In the first of these affidavits, which was provided on May 30, Hansen claimed that he "never used, looked at, depended on, or in anyway [sic] disclosed any Luxottica Confidential Information, for use for or to aid in, my current position with VSP, as President of Global Retail Development."

129. In the second of these affidavits, which was provided just before midnight on June 11, Hansen revealed that he sent LRNA's documents to VSP's Chief Marketing Officer, as set forth above. (*See* Exhibit R). These documents contained LRNA's and Luxottica's confidential and proprietary information.

130. Thus, Hansen's previous sworn affidavit and representations that he "never used, looked at, depended on, or in anyway [sic] disclosed any Luxottica Confidential Information"

and that "not a word, deed, paper, or idea that belongs to Luxottica has been used or transmitted by Mr. Hansen to anyone, period" were knowingly false.

131. Upon information and belief, Hansen made these representations to cover up the use and disclosure of LRNA's confidential and proprietary information, and to prevent LRNA from discovering that its information allowed VSP to plan around LRNA's strategic objectives and gives VSP a head start in building a competing retail eyewear division.

132. On June 18, counsel for LRNA demanded that VSP immediately cease and desist from any further acquisition, use, or disclosure of LRNA's confidential and proprietary information and trade secrets.

133. Upon information and belief, VSP is continuing to benefit from LRNA's confidential and proprietary information used and disclosed by VSP's officers and senior executives, including trade secrets belonging to LRNA and Luxottica.

134. Aided by confidential and proprietary information, VSP's officers and senior executives have planned and created a competing retail eyewear division for VSP. Their knowledge about what LRNA intends to achieve over the next three years allows them to plan around LRNA's strategic objectives and obtain an unfair competitive advantage over LRNA.

135. Aided by LRNA's confidential and proprietary information, upon information and belief, VSP has already saved and intends to further save the considerable time and expense of developing its own strategic plans and business methods from scratch, allowing VSP to "hit the ground running" in building a new retail eyewear business to compete against LRNA. LRNA invested significant time and resources to develop these strategic plans and business methods.

136.     VSP's entire effort to build a retail eyewear business to unfairly compete with LRNA is tainted by the unlawful disclosure and misappropriation of LRNA's trade secrets and confidential business information, and VSP's other unlawful acts as described above.

137.     As set forth below, LRNA is entitled to equitable relief, economic damages, punitive damages, and attorneys' fees to remedy VSP's willful misappropriation of trade secrets, tortious interference with business relations, conversion, unjust enrichment and unfair competition.

**COUNT I**
**VIOLATION OF OHIO UNIFORM TRADE SECRETS ACT**

138.     LRNA incorporates all preceding Paragraphs as though fully set forth herein.

139.     LRNA has maintained and developed valuable trade secrets.  These trade secrets include but are not limited to LRNA's strategic plans, retail strategies, performance metrics, revenue projections, business methods, sales information, profitability data, costs, margins, pipelines, and presentations.

140.     LRNA's trade secrets derive independent economic value from not being generally known or readily ascertainable to competitors of Luxottica.  For example, if competitors of Luxottica could ascertain its strategic plans and business processes, these competitors would obtain a head start and save the considerable time and expense of developing their own strategic plans and business methods independently.

141.     LRNA takes efforts that are reasonable under the circumstances to maintain the secrecy of these trade secrets.  These efforts include ethics policies, confidentiality policies and agreements, computer use policies, physical security measures, restrictions on the computer network, and 24-hour security personnel at its physical facilities.

142.     LRNA also stores information on servers that are only accessible to employees with approved rights to view information, and requires each individual employee to enter a unique password to access the computer network and their email accounts.

143.     LRNA also protects its trade secrets and confidential information through the use of agreements with contractors and executives. For example, LRNA entered into a Confidentiality Agreement with both Hauteman and Hansen, as well as an agreement with Gear Management, LLC to protect its confidential and proprietary information.

144.     VSP has wrongfully acquired LRNA's trade secrets, as set forth above. For example, upon information and belief, VSP's officers and senior executives have wrongfully acquired and used the final pipeline and process redesign for LRNA's new store delivery process, a confidential valuation summary for a retail acquisition opportunity, a 72-page presentation describing LRNA's strategic plans over the next three years, and other strategic information Hauteman and Hansen committed to memory based on their attendance at dozens of LRNA Leadership Team meetings.

145.     VSP and its officers and senior executives have acquired and disclosed trade secrets derived from or through persons who owed a duty to LRNA to maintain the secrecy and limit the use of these trade secrets.

146.     VSP's misappropriation of trade secrets belonging to LRNA and Luxottica has caused and will continue to cause LRNA to suffer irreparable harm.

147.     LRNA seeks equitable and injunctive relief preventing VSP from using or disclosing its trade secrets, as LRNA will suffer irreparable harm for which monetary damages could not afford adequate or complete relief.

148.    LRNA is entitled to compensatory damages in excess of $75,000, in an amount to be established at trial.

149.    VSP's misappropriation of LRNA's trade secrets to obtain an unfair competitive advantage was willful and malicious, justifying punitive and exemplary damages and attorneys' fees under Ohio law.

## COUNT II
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

150.    LRNA incorporates all preceding Paragraphs as though fully set forth herein.

151.    LRNA had a business relationship with Hansen as a senior executive and fiduciary of the company with a duty of utmost loyalty and good faith.

152.    VSP had knowledge of LRNA's business and fiduciary relationship with Hansen because its officers and senior executives knew that Hansen was a senior executive for LRNA.

153.    VSP also knew that Hansen was prohibited from communicating with any other person or company about confidential information, and was required to return any documents or other information to LRNA.  Hauteman, a Senior Vice President for VSP who contacted and recruited Hansen on behalf of VSP, was subject to the same obligations to LRNA.  In addition, VSP has established a relationship with its own executives to protect its confidential information.

154.    VSP intentionally interfered with and caused a breach of LRNA's business and fiduciary relationship with Hansen, as set forth above.

155.    VSP's interference with LRNA's business and fiduciary relationship with Hansen was improper.

156.    As a result of VSP's intentional interference with LRNA's business and fiduciary relationship with Hansen, LRNA has suffered substantial damages and irreparable harm.  For example, because VSP interfered in LRNA's business and fiduciary relationship with Hansen,

LRNA incurred damages and expended resources in conducting an investigation and filing a lawsuit to preserve its rights.

157.     VSP's intentional and tortious interference with LRNA's business and fiduciary relationship with Hansen was for its own financial benefit to obtain an unfair competitive advantage.

158.     VSP's intentional and tortious interference with LRNA's business and fiduciary relationship with Hansen was willful and malicious, justifying compensatory damages in excess of $75,000, as well as punitive and exemplary damages and attorneys' fees.

**COUNT III**
**CONVERSION**

159.     LRNA incorporates all preceding Paragraphs as though fully set forth herein.

160.     LRNA is the rightful owner of its confidential and proprietary information, files, documents, computer hardware, external hard drives, and other property.

161.     LRNA has demanded the return of its confidential and proprietary information, files, documents, computer hardware, external hard drives, and other property from Hansen, VSP's President of Global Retail Development.

162.     VSP wrongfully exercised control over LRNA's property when its President of Global Retail Development refused to return LRNA's confidential and proprietary information, files, documents, computer hardware, external hard drives, and other property.

163.     LRNA did not consent to the unlawful retention and use of its property for the benefit of VSP.

164.     VSP's willful disregard of LRNA's property rights had the probability of causing harm.

165.     LRNA has been damaged by VSP's conversion of LRNA's property.

166.     VSP's conversion of LRNA's property for its own financial benefit and unfair competitive advantage was willful and malicious, justifying compensatory damages in excess of $75,000, as well as punitive and exemplary damages and attorneys' fees.

## COUNT IV
## UNJUST ENRICHMENT

167.     LRNA incorporates all preceding Paragraphs as though fully set forth herein.

168.     LRNA's confidential and proprietary information was developed through significant time, effort, and expense.

169.     A benefit was conferred upon VSP when it received a head start in building a retail eyewear division through LRNA's confidential and proprietary information, as set forth above, saving VSP the considerable time and expense of developing its own plans and business methods from scratch.

170.     This allowed VSP to "hit the ground running" in building a retail eyewear division, aided by confidential and proprietary information that LRNA invested significant time and resources to develop.

171.     For example, in building a retail eyewear division, VSP benefited from Hansen's possession of a confidential LRNA presentation about Project Transformation, which contained the final pipeline and process redesign for LRNA's new store delivery process. Even with the help of Gear Management Group, LLC, and the benefit of an experienced team working on Project Transformation, this new store delivery pipeline still took LRNA six months to develop.

172.     Upon information and belief, VSP incurred considerable benefit through the possession of LRNA's new store delivery process by its President of Global Retail Development at the same time he was developing similar business processes for VSP.

173. VSP also incurred other considerable benefits through the possession of LRNA's confidential and proprietary information.

174. VSP knew of the benefits that were conferred upon it when it received a head start in building a retail eyewear division.

175. VSP was unjustly enriched by obtaining a head start in building a retail eyewear division through the possession and knowledge of LRNA's confidential and proprietary information.

176. VSP retained the benefit under circumstances where it would be unjust to do so without payment.

177. VSP has no legitimate defense for being unjustly enriched at the expense of LRNA.

178. LRNA is entitled to compensatory damages as a result of VSP's unjust enrichment in excess of $75,000, in an amount to be established at trial.

## COUNT V
## COMMON LAW UNFAIR COMPETITION

179. LRNA incorporates all preceding Paragraphs as though fully set forth herein.

180. As set forth above, VSP planned and/or created a retail eyewear division by secretly utilizing the assistance of Hansen while he was still a senior executive and fiduciary of LRNA.

181. VSP's Chief Executive Officer received strategic input, advice, and assistance while Hansen was still a senior executive and fiduciary of LRNA, entrusted with knowledge and inside access to Luxottica's competitive strategies and plans.

182.     VSP's development of a retail eyewear division to compete against LRNA through the input, advice, and assistance of a senior executive and fiduciary of LRNA constitutes unfair competition under the common law of Ohio.

183.     As a result of VSP's unfair competition, LRNA has suffered damages in excess of $75,000, in an amount to be determined at trial.

**COUNT VI**
**INJUNCTIVE RELIEF**

184.     LRNA incorporates all preceding Paragraphs as though fully set forth herein.

185.     VSP's aforementioned conduct would give it an unfair and unlawful competitive advantage over LRNA.

186.     Unless VSP is enjoined from the aforementioned conduct, LRNA will be irreparably harmed by the misappropriation of its confidential information and trade secrets, loss of goodwill, and present and future economic loss.  Monetary damages would not be an adequate remedy for the irreparable and continuing harm to LRNA's business.

187.     VSP's ongoing misappropriation of confidential information and trade secrets belonging to LRNA and Luxottica, and its inevitable use of confidential information and trade secrets, has caused and will continue to cause LRNA to suffer irreparable harm.

188.     LRNA seeks equitable and injunctive relief preventing VSP from, directly or indirectly, using or disclosing confidential information and trade secrets, as LRNA will suffer irreparable harm for which monetary damages could not afford adequate or complete relief.

189.     VSP's senior executives who have dealt directly with Hansen, VSP's Chief Marketing Officer, or anyone else who improperly received Luxottica's trade secrets and confidential information, as well as the process they have collectively undertaken to establish a

retail eyewear business to unfairly compete with LRNA, are tainted by the unlawful acts described above.

**WHEREFORE**, Plaintiff LRNA respectfully demands judgment as follows:

A.      An order providing for expedited discovery regarding the actual or potential possession, acquisition, access, review, use, or disclosure of any trade secrets or confidential information regarding LRNA or Luxottica by any executive, employee, agent or representative of VSP;

B.      An order providing that VSP must return all external hard drives, LaCie drives, emails, records, files, hard copies, and other documents and information that contain information obtained during Hansen's or Hauteman's employment with LRNA;

C.      An injunction against VSP restricting and enjoining, directly or indirectly, any further use, disclosure, or possession of information obtained by Hansen or Hauteman during their employment with LRNA, including but not limited to any confidential information or trade secrets;

D.      Compensatory and other damages against VSP in an amount to be determined at trial, with interest;

E.      Punitive and exemplary damages against VSP in an amount to be determined at trial, with interest;

F.      An award of Plaintiff's costs incurred in the prosecution of this action, including reasonable attorneys' fees; and

G.      Such other and further relief, legal and equitable, that this Court deems just and proper.

Respectfully submitted,


 /s/ Daniel J. Guttman
Daniel J. Guttman (0068034), Trial Attorney
Baker & Hostetler LLP
65 E. State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Email: dguttman@bakerlaw.com


/s/ Matthew L. Roberts
Matthew L. Roberts (0079938)
Baker & Hostetler LLP
65 E. State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Email: mroberts@bakerlaw.com


M. Scott McIntyre (0075298)
Baker & Hostetler LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
Telephone:  513-929-3400
Facsimile:   513-929-0303
Email: smcintyre@bakerlaw.com

*Attorneys for Plaintiff Luxottica Retail
North America Inc.*

Dated: July 14, 2014

## JURY TRIAL REQUESTED

Plaintiff requests a jury trial of all issues raised by the Complaint which are triable by

jury.

/s/ Daniel J. Guttman
Daniel J. Guttman (0068034), Trial Attorney
Baker & Hostetler LLP
65 E. State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Email: dguttman@bakerlaw.com


/s/ Matthew L. Roberts
Matthew L. Roberts (0079938)
Baker & Hostetler LLP
65 E. State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Email: mroberts@bakerlaw.com


M. Scott McIntyre (0075298)
Baker & Hostetler LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
Telephone:  513-929-3400
Facsimile:   513-929-0303
Email: smcintyre@bakerlaw.com

*Attorneys for Plaintiff Luxottica Retail*
*North America Inc.*

Dated: July 14, 2014